IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

GARY MILLER,

        Plaintiff,

v.

ALLIED PILOTS ASSOCIATION,

        Defendant.

Civil Action No. 4:26-cv-302

**FIRST AMENDED COMPLAINT**

Captain Gary Miller, a member of the Allied Pilots Association ("APA") labor union, brings the following Complaint to prevent the APA from denying him and other similarly situated pilots full access to the APA union member discussion forum, and to protect the rights of APA members to participate in this forum without fear of threats, intimidation, retaliation, reprisal, arbitrary censorship, or discipline imposed without the process required by federal law.

**PARTIES**

1.      Captain Gary Miller is a resident of Prosper, Denton County, Texas. He is employed as a Dallas-based Boeing 777 Captain for American Airlines, with over 40 years of experience as a skilled pilot and over 28 years with American Airlines. Captain Miller is a decorated military veteran with five combat tours, and he has been recognized by American Airlines for his excellence in training.

2.      Defendant APA is an unincorporated labor union with its principal office located in Fort Worth, Tarrant County, Texas. APA is authorized by federal law as the exclusive bargaining representative (labor union) for the approximately 16,000 pilots employed by American Airlines and has held that authority since approximately 1963.

1

## JURISDICTION AND VENUE

3.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action is arises under federal statute, including 29 U.S.C. §§ 411 and 412.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 139l(b)(l) as APA's principal office is located within this District and Division.

5.      Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) as the actionable conduct occurred within this District and Division.

6.      Venue is also proper in this Court pursuant to 29 U.S.C. § 412 as the actionable conduct occurred in this District and Division, and because APA's principal office is located within this District and Division.

## FACTUAL ALLEGATIONS

7.      The Allied Pilots Association is a "labor organization" as defined by the Labor-Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 402(i). APA is "engaged in an industry affecting commerce" as defined by the LMRDA because it "is the certified representative of employees under the provisions of ... the Railway Labor Act, as amended." 29 U.S.C. § 402(j)(1).

8.      APA has a Constitution and Bylaws ("CBL"), the Preamble of which states that its purpose is "to provide the mechanism whereby the collective and individual rights of APA pilots are safeguarded through a formula for sound leadership and, at the same time, retention of control of APA by the membership."

9.      Miller has been a member of the APA for 28 years, with such membership being mandatory for the majority of American Airlines pilots.

10.     APA maintains and supports a website and an electronic forum system called "The Line" that, according to the APA Policy Manual, "is intended to provide a platform that will allow for discussion of issues pertaining to the execution of American Airlines pilot duties between active members of the Association and other authorized participants."

11.     The Line is not merely a social website. It is a principal internal forum through which APA members meet, assemble, exchange information, discuss issues affecting their work as pilots, discuss issues affecting the union, and express views, arguments, and opinions to other APA members.

12.     APA members use The Line to discuss APA policy decisions, to criticize and defend APA leadership, to debate union initiatives, to discuss pending litigation involving APA, to share information about contract negotiations and election-related matters, and to engage in the day-to-day discourse of union democracy that the Labor-Management Reporting and Disclosure Act was enacted to protect.

13.     Access to The Line is a benefit of APA membership in good standing. The Acceptable Use Policy ("AUP") expressly provides that "the Line is reserved for and is available to apprentice members in good standing, active members in good standing, inactive members, and, where permitted, retirees," and that "APA members holding management positions with American Airlines, non-members and members who have been permanently suspended are not authorized use of The Line." Restriction of access to The Line is therefore a direct restriction on a benefit reserved for membership in good standing.

14.     Use of The Line requires each member, upon each log-in, to accept the terms of the AUP as an adhesion contract, a true and correct copy of which is attached to this Complaint as Exhibit 1 and incorporated by reference.

15. The AUP prohibits "off-topic posts and threads," but it does not define "off-topic" with objective criteria, does not identify who must make the determination in the first instance, does not require notice before removal or suspension, does not require an opportunity to respond before a suspension, and does not provide any appeal from an initial suspension from The Line.

16. The AUP's text expressly identifies the consequences of a first-instance off-topic determination to review, movement, or deletion of the post. AUP § Specific Terms and Conditions, item 11, provides: "Users may not make off-topic posts and threads. If a post or thread is deemed off-topic from the forum in which it is posted, it may be placed under review subject to further review and action or moved to the appropriate forum if one exists. If there is no authorized forum for the post or thread, it will be subject to review and deletion." The AUP does not, on its face, authorize a member's suspension based on a first-instance determination that a post is merely off-topic.

17. The AUP further provides that a violation of the AUP may result in "(3) union discipline in accordance with the Constitution & Bylaws." APA itself thus classifies AUP violations as conduct that may trigger Article VII union discipline. Article VII of APA's Constitution and Bylaws prescribes the formal disciplinary process for such conduct, including written specific charges, notice of hearing, the right to representation, a court-reported full and fair hearing, a written decision, an appeal to APA's Appeal Board, and ultimate review by a Neutral Arbitrator. Article VII, Section 1.B.2 separately bars Article VII charges from being filed against any National Officer, Domicile Officer, member of the Board of Directors, or committee member "based upon actions/decisions taken or made within the scope of his/her official duties."

4

18.   The AUP further provides that a first suspension may last up to 14 business days and that a second suspension "following an initial suspension will subject a participant to immediate permanent suspension."

19.   The AUP therefore operates not only as a rule for removing posts, but also as a disciplinary enforcement regime that can restrict a member's access to the principal internal forum through which members communicate with one another.

20.   APA maintains fleet-specific forums within The Line, including a "777 System & Training Forum" or "777 Systems and Training" subforum used by pilots to discuss Boeing 777 operations, systems, training, international flying, ETOPS, long-haul operations, crew practices, layover practices, commuting issues, and related matters affecting pilots who fly or discuss Boeing 777 operations.

21.   On February 26, 2025, Captain Miller published a post on The Line subforum "777 Systems and Training" titled "Studying 777 and ETOPS at the historic Grand Canyon airport."

22.   Captain Miller made the post after going to The Line intending to post in a travel-related forum, but that forum had been removed. Because the post concerned aviation, 777 study, and ETOPS, Captain Miller posted it in the 777 Systems and Training subforum.

23.   In the period leading up to Captain Miller's post, APA had eliminated multiple subforums on The Line, including the travel forum and other general-discussion forums. The disclaimer banner displayed on every page of The Line at the time of Captain Miller's post confirmed that APA had restricted The Line to only two categories of subforum on a "trial basis": "The Help Desk (Contract/CBA Q&A and Scheduling Q&A) and Fleet Systems & Training." APA's reduction of the available forums concentrated all member-to-member discussion of any

aviation-adjacent subject in the few remaining subforums, including the 777 Systems and Training subforum on which Captain Miller posted.

24.    Captain Miller's post also referenced "ETOPS regulations" and linked the modern 777/ETOPS subject matter to the history of long-distance aviation, including early aviators associated with the historic Grand Canyon airport.

25.    ETOPS is directly relevant to Boeing 777 pilots. ETOPS concerns extended-range twin-engine operations and is a significant operational and training subject for pilots flying long-range Boeing 777 routes.

26.    ETOPS qualification is a regulatory prerequisite to operating a Boeing 777 on the long-range overwater and overland routes for which the aircraft was designed and on which American Airlines deploys it. Maintaining current ETOPS knowledge is part of the continuing study, training, and qualification a 777 captain must perform. Captain Miller's post was, on its face, about studying 777 systems and ETOPS; the very title of the post was "Studying 777 and ETOPS at the historic Grand Canyon airport."

27.    Captain Miller's references to early aviators—Charles Lindbergh, Amelia Earhart, and Will Rogers—were not extraneous to a 777 Systems and Training discussion. Lindbergh flew air-mail routes for Robertson Aircraft Corporation, an early predecessor to American Airlines, tying Lindbergh directly to American Airlines' institutional history and to the long-distance, long-route operations that ETOPS now governs. Captain Miller's post connected this aviation history to the modern 777/ETOPS subject matter and to the shared professional experience of American Airlines pilots flying long-haul routes.

28.    Captain Miller's post was intended to communicate with other 777 pilots about studying 777 systems and ETOPS in a memorable, aviation-centered way. The post used

6

storytelling, aviation history, and photographs to discuss how Captain Miller studied 777 and ETOPS material while visiting a historic aviation site.

29.     Captain Miller's post was not obscene, defamatory, threatening, harassing, discriminatory, commercial, unlawful, or disruptive. It did not encourage illegal job action. It did not disclose confidential information. It did not interfere with APA's legal or contractual obligations.

30.     On March 11, 2025, without any prior notice or communication, APA attorney Jared Kelly informed Captain Miller that Vice President Chris Torres, acting as President's Designee, had imposed a 14-day suspension from The Line after deeming this post "off-topic." A true and correct copy of this email is attached here as Exhibit 2 and incorporated by reference.

31.     APA did not accuse Captain Miller's post of violating any AUP category other than "off-topic."

32.     The Line permits, and APA has allowed, numerous posts and threads in the 777 Systems and Training forum that are not limited to technical aircraft systems or formal training. On information and belief based on review of the 777 System & Training Forum, contemporaneous threads APA has tolerated within the same subforum include, but are not limited to: a thread titled "JFK Courtyard Marriott Hotel" concerning crew layover hotel arrangements; a thread titled "Living UK" concerning expatriate lifestyle from the United Kingdom; a thread titled "Bob's Watches" concerning the purchase of luxury watches; and a thread titled "How to Avoid Getting Fat" concerning diet and weight management. None of these threads concerned 777 systems or 777 training. None has been removed, and none has resulted in suspension of any participant. Additional tolerated threads concern brown-bagging food on 777 trips, layover food practices, use

of onboard ovens and chillers, commuting from the United Kingdom, hotel crew rates near JFK, duty-free watches, and other practical matters not limited to aircraft systems or formal training.

33.     Within the 777 Systems and Training subforum an APA-designated moderator, identifiable by his "Moderator" badge displayed under his name on The Line, participated in the off-topic "How to Avoid Getting Fat" thread by posting his own off-topic comments. APA did not remove that moderator's posts, place that moderator's posts under review for being off-topic, or suspend the moderator from The Line.

34.     APA Board of Directors member John McIlvenna, identifiable by the "Board of Directors" badge displayed under his name on The Line, has posted on The Line off-topic material having no connection to any approved subforum. Examples include a "Did You Miss Me??" meme image based on Stanley Kubrick's film "The Shining" and a post stating, "Will ginko help me remember my flows....or help me give a crap about whatever the latest drivel that comes out of AA?" APA has not removed those posts, placed those posts under review for being off-topic, or suspended Director McIlvenna from The Line.

35.     Such posts remain visible on The Line, have received numerous member responses, and have been treated as acceptable discussion within the 777 forum.

36.     APA's tolerance of such other practical, travel, layover, commuting, food, hotel, and crew-life discussions in the 777 forum demonstrates that the forum is not enforced as a narrow technical-only forum limited to aircraft systems manuals or formal training events.

37.     On information and belief, Vice President Torres has himself posted on The Line on subjects unrelated to the specific subforums in which his posts have appeared, and APA has structured its forum software so that posts by Vice President Torres and other moderators are not

searchable by ordinary members. This asymmetry insulates officer posting practices from the same scrutiny APA applies to rank-and-file member posting practices.

38.     APA's Constitution and Bylaws, Article VII, Section 1.B.2, expressly bars Article VII charges from being filed against any National Officer, Domicile Officer, member of the Board of Directors, or committee member "based upon actions/decisions taken or made within the scope of his/her official duties." APA's enforcement scheme therefore creates a facially asymmetric speech regime: ordinary members face suspension or formal Article VII discipline for AUP violations, while APA officers and directors are immunized from comparable discipline for like conduct undertaken in their official capacities.

39.     APA's deletion of Captain Miller's post was therefore not a neutral or consistent application of an objective topic rule. It was arbitrary, selective, and materially inconsistent with APA's treatment of other comparable posts.

40.     The March 11, 2025 notice did not identify any facts showing why Captain Miller's post was off-topic when compared to other tolerated posts in the 777 forum.

41.     The March 11, 2025 notice did not identify any safety risk, harassment, threat, unlawful conduct, interference with APA's contractual obligations, disclosure of confidential information, or disruption caused by Captain Miller's post.

42.     The March 11, 2025 notice did not provide written specific charges under APA's CBL disciplinary procedures.

43.     The March 11, 2025 notice did not provide Captain Miller a reasonable time to prepare a defense.

44.     The March 11, 2025 notice did not offer Captain Miller a hearing before the suspension took effect.

45.     The March 11, 2025 notice did not offer Captain Miller an appeal from the 14-day suspension.

46.     The March 11, 2025 notice did not cite any specific numbered AUP provision. It did not state any objective criterion by which Captain Miller's post was deemed off-topic. It did not state any standard distinguishing posts that warrant suspension from posts that warrant only the AUP's prescribed remedies of review, movement, or deletion. It did not state who initially identified the post as off-topic, what process Vice President Torres followed in adjudicating the question, or whether any 777-qualified person was consulted.

47.     Vice President Torres, who imposed the suspension as the "President's Designee," is a Boeing 737 captain. He has never flown the Boeing 777 and, on information and belief, has no operational ETOPS experience. He nevertheless adjudicated unilaterally, without consulting any 777-qualified pilot, whether a 777-qualified captain's post about studying 777 systems and ETOPS regulations was germane to the 777 Systems and Training subforum.

48.     The suspension barred Captain Miller from using The Line during the suspension period and prevented him from participating in the principal member forum used by APA members to communicate with one another.

49.     During the suspension period, Captain Miller was separated from comparable APA members in good standing who retained access to The Line and who could continue to read, post, respond, and participate in ongoing member discussions.

50.     The suspension therefore impaired Captain Miller's membership rights by excluding him from an important union-member communications forum made available to other members in good standing.

51.    The suspension also placed Captain Miller in a materially different position from comparable APA members because, under the AUP, any later alleged non-compliance following the initial suspension would subject him to immediate permanent suspension from The Line.

52.    During the 14-day suspension, Captain Miller was unable to read, post on, or respond to discussions on The Line concerning union business, including discussions of pending litigation against APA, leadership statements concerning that litigation, member discussions of policy initiatives, election-related communications, and ongoing member-to-member discussion of working conditions affecting Boeing 777 captains. Other APA members in good standing experienced no comparable restriction during the same period and remained free to participate in those discussions.

53.    Captain Miller's first-suspension status is, by APA's own representation, a permanent entry on his APA record. APA's counsel represented on August 25, 2025, that there is no basis or mechanism to expunge or remove the suspension. As a direct consequence, the AUP's two-strike enforcement structure, under which a participant becomes subject to "immediate permanent suspension" upon a second suspension, operates against Captain Miller permanently and does not operate against members who have never been suspended. The differential treatment is present, ongoing, and material.

54.    Captain Miller is thus subject to a stricter enforcement regime than other APA members in good standing. Any future post APA deems non-compliant with the AUP can be punished by immediate permanent suspension without an intervening warning or graduated step, and would impair Captain Miller's status as a member in good standing entitled to use The Line. Members without prior suspensions, by contrast, are entitled under the AUP's own structure to a

non-permanent first response. The differential applies prospectively to every post Captain Miller makes on The Line.

55.    The "appeal" to the Appeal Board that the AUP provides for permanent suspensions is post-deprivation: it allows the affected member to contest a permanent suspension only after access has been terminated. The AUP's appeal procedure does not include the procedural protections that 29 U.S.C. § 411(a)(5) requires—written specific charges issued before discipline is imposed, a reasonable time to prepare a defense, and a full and fair hearing before the disciplinary action takes effect. The AUP appeal mechanism is therefore not a substitute for the pre-discipline due-process protections that Section 411(a)(5) requires.

56.    The threat of immediate permanent suspension was not theoretical. It was the stated consequence of what could be imposed by the AUP after an initial suspension and applied to Captain Miller after March 11, 2025.

57.    The threat of permanent removal chilled Captain Miller's willingness and ability to participate fully in The Line because any future post that APA later deemed non-compliant could result in permanent exclusion from the forum.

58.    The threat also chilled other APA members because APA's enforcement signaled that a member could be removed from The Line and placed at risk of permanent exclusion for a post that is aviation-related, non-disruptive, and comparable to other tolerated posts.

59.    APA's conduct is not isolated, with a similarly situated plaintiff filing suit in this same district in 2025 documenting similarly arbitrary and chilling removals of union member communications without due process. *Mitchell Vasin v. Allied Pilots Association*, No. 4:25-cv-00880 (N.D. Tex. Aug. 15, 2025).

60.     Captain Mitchell Vasin, the plaintiff in that pending action, was himself suspended from The Line by APA. After he filed suit alleging LMRDA violations and was reinstated, he published on The Line a summary of his allegations against APA. On information and belief, Captain Vasin has since been appointed or elected to APA's Board of Directors, where he continues to maintain publicly that APA has violated and continues to violate the LMRDA in its administration of The Line. A true and correct copy of this post is attached here as Exhibit 3 and incorporated by reference. APA's enforcement of the AUP against Captain Miller, while seating on its own Board a member who publicly maintains the same LMRDA-violation theory Captain Miller asserts here, is further evidence that the off-topic determination at issue was viewpoint- and speaker-driven rather than a neutral application of any reasonable rule.

61.     APA is also on notice of the LMRDA protections of union member speech and due process in relation to an APA online forum from the ruling in *Emery v. Allied Pilots Association,* in which the court found "The APA acknowledges that a union cannot impair a members's [sic] right of free speech merely because it disagrees with the content of that speech." *Emery v. Allied Pilots Ass'n*, 227 F. Supp. 3d 1292, 1302 (S.D. Fla. 2017).

62.     The LMRDA's legislative history "reveals that Congress modeled Title I after the Bill of Rights, and that the legislators intended § 101 (a)(2) to restate a principal First Amendment value—the right to speak one's mind without fear of reprisal." *United Steelworkers of Am., AFL–CIO–CLC v. Sadlowski*, 457 U.S. 102, 111 (1982).

63.     Section 411(a)(2) protects, by its plain text, the right of every union member "to express any views, arguments, or opinions." Its protection is not limited to speech that explicitly criticizes union leadership or addresses union policy in formal terms. Member-to-member communication on a union forum about shared professional subjects, communication that protests

13

a leadership decision affecting member-to-member communication itself, and communication that builds member cohesion and mutual support all fall within the statute's protection.

64.     The LMRDA permits unions to enforce reasonable rules in limited circumstances, including rules as to the responsibility of every member toward the organization as an institution and rules necessary to prevent interference with the union's legal or contractual obligations.

65.     Captain Miller's post did not implicate any such concern. APA did not contend that Captain Miller's post interfered with APA's legal or contractual obligations, disrupted union operations, threatened the union as an institution, or violated any meeting rule.

66.     APA's enforcement of the AUP against Captain Miller was unreasonable as applied because it punished an aviation-related, 777/ETOPS-related post while allowing materially comparable or less-related posts to remain in the same forum.

67.     APA's enforcement of the AUP was also unreasonable because it imposed a suspension and risk of permanent removal without prior notice, written specific charges, a reasonable time to prepare a defense, a hearing, or an appeal.

68.     On August 25, 2025, APA's counsel represented that there is no basis or mechanism to expunge or remove the suspension.

69.     After Captain Miller expressly invoked 29 U.S.C. § 411, APA ceased responding.

70.     APA ignored a written demand Captain Miller sent directly to Vice President Torres on October 24, 2025.

71.     APA ignored a written demand Captain Miller sent directly to Jared Kelly, attorney for the APA, on February 9, 2025.

72. There is no internal APA remedy available to Captain Miller to expunge the suspension, remove the continuing threat of permanent suspension arising from the initial suspension, restore the deleted post, or obtain a hearing concerning the initial suspension.

73. Captain Miller now has no choice but to file suit to protect full access to the APA union-member discussion forum and to protect the right of APA members to participate in this forum without fear of threats, intimidation, retaliation, reprisal, arbitrary censorship, or discipline imposed without due process.

## COUNT I
### INFRINGEMENT UPON UNION MEMBER FREE SPEECH
### IN VIOLATION OF 29 U.S.C. § 411(a)(2)
### (February 26, 2025 post)

74. Captain Miller realleges the allegations above as if fully set forth here.

75. Section 101(a)(2) of the LMRDA, 29 U.S.C. § 411(a)(2), protects the right of every labor-organization member to meet and assemble freely with other members and to express views, arguments, or opinions.

76. The Line is a principal forum through which APA members meet, assemble, and express views, arguments, and opinions to one another concerning matters affecting pilots, pilot duties, and APA membership.

77. On February 26, 2025, Miller made a post on The Line titled "Studying 777 and ETOPS at the historic Grand Canyon airport."

78. The post concerned aviation, 777 study, ETOPS regulations, and the shared professional experience of 777 pilots.

15

79. The post was germane to the 777 forum because ETOPS is a subject relevant to Boeing 777 operations and training, and because APA permits comparable practical and operational discussions in that forum.

80. APA deleted Captain Miller's post after an arbitrary, selective, and unreasonable determination by APA Vice President Chris Torres or another President's Designee that the post was "off-topic."

81. APA's deletion of the post interfered with Captain Miller's right to express views, arguments, and opinions to other APA members.

82. APA's deletion of the post also interfered with the rights of other APA members to receive, respond to, and discuss Captain Miller's communication.

83. APA's off-topic rule, as applied to Captain Miller, was not a reasonable rule under 29 U.S.C. § 411(a)(2) because APA applied it selectively to suppress Captain Miller's protected member speech while allowing comparable posts to remain in the same forum.

84. APA's application of the AUP to Captain Miller was not necessary to conduct a union meeting, ensure individual responsibility to the union as an institution, or prevent interference with APA's legal or contractual obligations.

85. APA's conduct chilled Captain Miller and other APA members from participating in The Line because APA demonstrated that it may delete speech and suspend a member based on an undefined, inconsistently applied "off-topic" determination.

86. Captain Miller's post implicated LMRDA-protected interests. The post discussed studying 777 systems and ETOPS regulations, subjects directly relevant to APA members' shared employment as 777 captains, and it was published on a principal internal forum APA maintains for member-to-member communication. Communications between union members on such a forum,

16

including communications that protest leadership decisions affecting member-to-member communication itself, lie squarely within the "views, arguments, or opinions" that Section 411(a)(2) protects.

87.     APA's off-topic rule, both facially and as applied, is not a "reasonable" rule within the meaning of 29 U.S.C. § 411(a)(2). The rule defines "off-topic" only by reference to whatever subforum a single APA officer subjectively concludes is appropriate; vests unlimited adjudicative discretion in the President or a Designee; provides no objective criteria, no notice, no opportunity to respond, no hearing, and no appeal before suspension; authorizes only post-movement or deletion for first-instance off-topic posts, but is enforced in practice through suspensions; is enforced selectively against rank-and-file members like Captain Miller while officers and directors posting comparable or more clearly off-topic content face no comparable enforcement; and operates against a backdrop in which APA has eliminated alternative subforums that would have allowed members to discuss the same subjects elsewhere on The Line.

88.     The infringement on Captain Miller's speech rights was not minimal. APA suspended him for fourteen days from the principal internal forum APA maintains for its members, deleted his post entirely rather than moving it as the AUP's text contemplates, and placed him on a permanent record exposing him to immediate permanent suspension for any future post APA deems non-compliant. The chilling effect of that enforcement is ongoing and extends to other members who observe APA's treatment of Captain Miller.

89.     The APA has therefore unlawfully infringed upon Captain Miller's rights under 29 U.S.C. § 411(a)(2).

17

**COUNT II**
**DISCIPLINE OF A UNION MEMBER WITHOUT DUE PROCESS**
**IN VIOLATION OF 29 U.S.C. § 411(a)(5)**

90.     Captain Miller realleges the allegations above as if fully set forth here.

91.     Section 101(a)(5) of the LMRDA, 29 U.S.C. § 411(a)(5), provides that no member of a labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues unless the member has been served with written specific charges, given a reasonable time to prepare a defense, and afforded a full and fair hearing.

92.     On March 11, 2025, APA suspended Captain Miller from The Line for 14 days.

93.     The Line is a union-member forum made available to APA members in good standing and used for member communications concerning pilot duties, union affairs, and member participation.

94.     By suspending Captain Miller from The Line, APA deprived him of access to a union-member communications forum available to comparable members in good standing.

95.     The suspension separated Captain Miller from comparable APA members in good standing because other comparable members retained access to read, post, respond, and participate in The Line while Captain Miller could not.

96.     The suspension impaired Captain Miller's membership rights because it restricted his ability to participate in an important channel of union-member communication.

97.     APA also placed Captain Miller in a materially different and more precarious position than comparable members by subjecting him, after the first suspension, to immediate permanent suspension for any future alleged non-compliance with the AUP.

18

98. That continuing threat of permanent exclusion from The Line is a punitive consequence arising from the initial suspension and chills Captain Miller's future exercise of protected member rights.

99. APA's suspension of Captain Miller and imposition of the continuing threat of permanent removal constitute discipline within the meaning of 29 U.S.C. § 411(a)(5).

100. The suspension of Captain Miller bears a direct relation to his membership in APA. Access to The Line is, by the AUP's own terms, a benefit reserved for members "in good standing"; permanent suspension is, by the AUP's own terms, the consequence imposed on members "who have been permanently suspended" and on non-members. Restricting Captain Miller's access to The Line therefore restricts a benefit that flows from, and is conditioned on, his membership status.

101. The suspension and the resulting permanent record "separate" Captain Miller from comparable APA members in good standing. During the suspension, Captain Miller was barred from a forum on which other members in good standing could read, post, respond, and participate in discussions of union business, pending litigation, leadership statements, and working conditions. Going forward, Captain Miller is subject under the AUP to immediate permanent suspension upon any future AUP non-compliance, while members without prior suspensions are entitled to a non-permanent first response. That differential is permanent, ongoing, and material.

102. APA itself has classified AUP violations as conduct that may trigger "union discipline in accordance with the Constitution & Bylaws," meaning Article VII. APA cannot simultaneously enforce the AUP as a disciplinary regime and disclaim the procedural protections that 29 U.S.C. § 411(a)(5) attaches to union discipline. The Appeal Board mechanism available only after a permanent suspension is post-deprivation and does not include the pre-discipline

19

protections—written specific charges, reasonable time to prepare a defense, and a full and fair hearing before discipline is imposed—that Section 411(a)(5) requires.

103. APA did not serve Captain Miller with written specific charges before suspending him or placing him under the continuing threat of permanent removal.

104. APA did not provide Captain Miller a reasonable time to prepare a defense before suspending him or placing him under the continuing threat of permanent removal.

105. APA did not afford Captain Miller a full and fair hearing before suspending him or placing him under the continuing threat of permanent removal.

106. APA did not provide Captain Miller an appeal or other meaningful mechanism to challenge the initial suspension, expunge it, remove its consequences, or obtain restoration of his deleted post.

107. APA's suspension of Captain Miller from The Line and its imposition of the continuing threat of permanent removal directly violate 29 U.S.C. § 411(a)(5).

## ATTORNEYS' FEES

108. Captain Miller seeks attorneys' fees and costs under 29 U.S.C. § 412 and other applicable law.

## CONDITIONS PRECEDENT

109. There are no internal remedies to exhaust prior to bringing this action.

110. Alternatively, any purported internal remedy is unavailable, inadequate, or futile because APA has taken the position that there is no basis or mechanism to expunge or remove the suspension, has not provided an appeal from the initial suspension, and has not responded to Captain Miller's demands invoking his rights under 29 U.S.C. § 411.

20

## PRAYER FOR RELIEF

Captain Miller respectfully requests the Court enter judgment in his favor and for relief against Defendant Allied Pilots Association as follows:

A. A judgment that APA's application of the AUP to Captain Miller violated 29 U.S.C. § 411(a)(2);

B. A judgment that APA's suspension of Captain Miller from The Line and imposition of the continuing threat of permanent removal violated 29 U.S.C. § 411(a)(5);

C. A judgment that the AUP, as applied through undefined and selectively enforced "off-topic" determinations without notice, hearing, or appeal, violates free speech and due process rights under the LMRDA;

D. A preliminary and permanent injunction requiring APA to restore Captain Miller's February 26, 2025 post to The Line;

E. A preliminary and permanent injunction requiring APA to expunge or remove Captain Miller's suspension and any related designation, record, or consequence arising from the March 11, 2025 suspension;

F. A preliminary and permanent injunction prohibiting APA from imposing suspensions, permanent removals, or other discipline from The Line without the process required by 29 U.S.C. § 411(a)(5);

G. Attorneys' fees and costs; and

H. Such other and further relief as the Court deems just and proper.

Dated: May 12, 2026

Respectfully submitted,

**Scale LLP**

By: */s/ James H. Creedon*
James H. Creedon
Texas Bar No. 24092299
Charles A. Wallace
Texas Bar No. 24110501
5 Cowboys Way, Suite 300
Frisco, Texas 75034
Tel. 415.735.5933
jcreedon@scalefirm.com
cwallace@scalefirm.com

**ATTORNEYS FOR PLAINTIFF
GARY MILLER**

22